**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| MARIO GIL | CIVIL ACTION NO: 6:24-cv-00201 |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| ABC INSURANCE CO., ENI US OPERATING CO. INC., AND SAIPEM AMERICA, INC. | MAGISTRATE JUDGE AYO |

### ENI US'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

ENI US submits this Reply in further support of its Motion for Summary Judgment ("Motion," R. Doc. 57) and in response to Plaintiff's Opposition (R. Doc. 68), which does not identify any genuine disputes of material fact, and relies on misguided (or wrong) legal and factual assertions. ENI US is entitled to summary judgment under all three grounds in the Motion: (1) independent contractor defense; (2) time charterer non-liability; or (3) no viable claim under 33 U.S.C. §905(b)/*Scindia* duties.[1]  All defined terms in the Motion are used in this Reply.

**1.      The Undisputed Facts Confirm Application of the Independent Contractor Defense**.

Plaintiff does not dispute that ATS, Saipem and HESI were independent contractors; and never engages the governing standard that a principal is not liable for injuries to independent contractors unless the principal retains or exercises control over the "step-by-step process" and "operative detail" or "manner of performance" of the work.[2] He identifies no evidence that ENI US told ATS, HESI, or Saipem *how* to perform their work, which is dispositive: "[A]bsent an express or implied order to the contractor to engage in an unsafe work practice, a principal…cannot be liable under the operational control exception."[3]

---

[1] Plaintiff has not opposed Eni/Saipem's motion for summary judgment dismissing any seaman status/claims (R. Doc. 51); and has thus conceded he **is not a seaman**, and is limited to 33 U.S.C. §905(b)/*Scindia* vessel negligence claims.

[2] *Grammer v. Patterson Servs., Inc.*, 860 F.2d 639, 642-45 (5th Cir. 1988); *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) ("[O]nly instructions [on] 'how to' conduct operations [trigger] operational control exception.").

[3] *Fruge*, 337 F.3d 558 at 564.

### A.    No Evidence of Operational Control

Plaintiff asserts ENI US employees "monitor[ed] and direct[ed] operations" (Opp., p. 7, p. 11), relying on SANTORINI Master Morris's generalized statement that Saipem rig crew "conduct[ed] operations as directed by [ENI US]" (*id*. at p. 5). This mischaracterizes Morris's testimony and the evidence as a whole. The *specific* operations/location related to Plaintiff's alleged incident were within Saipem's control/responsibility: the Saipem "rig super[intendant] deals with the particulars of what's happening on the drill floor" and it was Saipem's "responsibility to maintain the facility [and] facility design."[4]  And Plaintiff confirmed the Saipem driller was generally in charge of operations, while he himself was in charge of ATS's scope of work (alongside HESI), and no ENI US personnel were present.[5] Fifth Circuit law is clear that mere *generalized* involvement in *overall* operations does not amount to operational control; the control inquiry must be framed in terms of "the underlying action," the "instrumentality" involved, and "occasion specifics."[6] Gil's "occasion specifics" testimony confirms ENI US had no operational control: Saipem was in charge of "the underlying [operations]" and "instrumentality" involved (step area); Gil was in charge of the ATS operations (alongside HESI); and no ENI US personnel were present.  Any general oversight by ENI US personnel is legally irrelevant.

### B.    Irrelevance of Company Man and Safety Personnel Aboard.

Plaintiff repeatedly notes (*see* Opp., pp. 2-5) the undisputed fact that ENI US had a company man and safety representative on the Vessel. But it is well-settled that mere presence and

---

[4] R. Doc. 68-9, p. 17:1-4, 15-20. *See also id*. at p. 19:16-24 (Saipem responsible for accident area); p. 20:6-11 (Saipem responsible for non-skid); p. 94:21-25; p. 95:1 (Saipem responsible for conditions in area).

[5] R. Doc. 69-5, p. 97:10-14 (HESI); p. 218:3-11 (Saipem driller); p. 219:23-25 (Gil/ATS); p. 271:1-21 (Gil returned to rig floor/drill shack after his incident, and spoke with Saipem driller, but eventually had to leave to go tell ENI US company man, confirming company man was never present at the time of and post-incident).

[6] *Coleman v. BP Expl. & Prod*., 19 F.4th 720, 732-33 (5th Cir. 2021).

general oversight of a principal's company representative/safety man, and periodic inspection or monitoring of work, do not constitute operational control.[7] Master Morris confirmed it was Saipem's rig crew – not ENI US – that were in charge of the drill-floor operations underway at the time of the alleged incident; and that Saipem was responsible for the transition step and general area of Gil's alleged incident.[8] Gil himself confirmed *he was in control* of the ATS work, and that Saipem's driller was generally in charge at all relevant times of ongoing operations on the drill floor, without ENI US involvement (*see* FN 5 *supra*).  ENI US's shoreside safety manager confirmed Saipem alone was responsible for the layout, condition, and housekeeping of the incident area.[9] Mere presence of ENI US personnel is legally irrelevant.

Plaintiff's attempts to distinguish *Chiasson*, *Gantt*, and *Menard* (Opp. pp. 7-8) rely entirely on ENI US's mere physical presence on the vessel. But again, mere presence is not the test as confirmed in *Ainsworth*, *Fruge* and other cases cited here and in the Motion.

### C.    Irrelevance of ENI US's Generalized Interest in Safety and Safety Policies.

Plaintiff contends ENI US's "safe work practices" (Opp., p. 5), its post-incident reporting, presence of safety personnel, and monitoring of injuries (*id.*, pp. 2-5) create an issue of fact. But "the fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control."[10] Requiring compliance with safety rules and generally attending to safety is likewise insufficient: "The fact that a principal

---

[7] *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549–50 (5th Cir. 1987); *Fruge*, 337 F.3d at 564 ("periodic inspections by a principal's company man do not equate to that principal retaining control over the operations conducted by a drilling crew"); *Etheridge v. Sub Sea Int'l*, 1992 U.S. Dist. LEXIS 7124, *2 (E.D. La. May 5, 1992); 1992 WL 116031 ("[M]ere presence of a company safety man who takes an active interest in the safety of the employees of the independent contractor, does not, in and of itself, constitute operational control."); *Skinner v. Schlumberger Tech. Corp.*, 655 Fed. Appx. 188, 193 (5th Cir. 2016) (same) (citing *Fruge,* 337 F.3d at 564).

[8]  R. Doc. 68-9, p. 15:15–25; p. 16:3-25; p. 17:1-10; p. 27:16-29; p. 67:7-25; p. 68:1-3 (Saipem in charge of drill floor operations); R. Doc. 68-9, p. 17:15-20; p. 19:10-24; p. 94:21-25; p. 95:1; p. 20:6-11 (Saipem in charge of stair area).

[9] R. Doc. 68-2, p. 44:4-25; p. 45:1-25.

[10] *Hebert v. CXY Energy, Inc.*, 72 F. Supp. 2d 681, 686 (W.D. La. 1999).

reserves the right to monitor its contractor's performance and stations a 'company man' … who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his superiors, does not mean that the principal controls the methods or details of the contractor's work."[11] Plaintiff's emphasis on ENI US's general safety involvement is legally irrelevant.

### D.      The Contracts, including the Bridging Document, are Dispositive

The Bridging Document *contractually allocates* responsibility for the incident area to Saipem, including at Element 15: "Santorini Master (OIM) is ultimately responsible for safety and integrity of the Ship and personnel on board."[12]  Master Morris's testimony confirms Saipem's control of the operations/area,[13] as per the Bridging Document and DC/TC. And as the Fifth Circuit has specified "the supervision and control that is actually exercised by the principal is **less important** than the right to control that is contractually reserved."[14] The argument that ENI US had a generalized Bridging Document duty to "conduct their operations in a safe, efficient manner also" (Opp., p. 5) is irrelevant: *ENI US was not involved* in any of the relevant operations, nor was it contractually allocated any relevant responsibility under the Bridging Document or otherwise.

Plaintiff's Opposition does not even mention the other operative contracts – which the Fifth

---

[11] *Coulter v. Texaco, Inc.,* 117 F.3d 909, 912 (5th Cir. 1997); *Padgett v. Fieldwood Energy, LLC*, 2020 U.S. Dist. LEXIS 20986, *12 (W.D. La. Jan. 31, 2020); 2020 WL 524868 ("[Requirement to comply with principal's safety standards] does not constitute operational control sufficient to vitiate the independent contractor relationship."). *Alexander v. Kevin Gros Consulting & Marine Servs., Inc.*, 2016 U.S. Dist. LEXIS 13477, at *6 (E.D. La. Feb. 4, 2016); 2016 WL 430413 ("[Presence] of a 'company man' who follows the principal's safety protocol does not create a question of material fact"; no operational control viz. MSA requirement to follow principal's safety protocols/manual; and "no appreciable difference between federal maritime law and [LA law] on this point"). *See Menard v. LLOG Expl. Co., LLC*, 259 F. Supp. 3d 475, 481 FN 26 (E.D. La. 2017) (same Re: LA/ maritime law).

[12] *See* R. Doc. 57-6, SPCM 00034-36 (Saipem responsible as follows: Element 2 - "[f]acility mechanical, facility design… and process design"; Element 3 – "[c]onduct, manage, and communicate the hazards analysis (facility level) for equipment, materials or processes owned or contracted by [Saipem, *which would include the port-a-let*]"; Element 6 – "[c]ontrol the presence, entrance and exit of personnel in the [Saipem's] operating area. (on the rig)."

[13] R. Doc. 68-9, p. 15:19–25; p. 16:8–20; p. 17:4–10; p. 19:10-24; p. 94:21-25; p. 95:1; p. 20:6-11.

[14] *Coleman*, 19 F.4th at 730 FN2.

4

Circuit instructs courts to examine first[15] - that allocate responsibility to ENI US's contractors. The ENI US–HESI contract requires HESI to provide the personnel, equipment, supervision, and technical support necessary to plan, coordinate, and perform the services (R. Doc. 57-3, App'x D §§4-5, ENI-SANTORINI_000620), with HESI in turn subcontracting a portion of the work to ATS; while the ENI US- Saipem DC/TC (including the Bridging Document) requires Saipem to furnish the vessel, equipment, and personnel and to manage health, safety, environmental, and related safety matters (R. Doc. 57-5, Arts. 2, 8, SPCM 000072, 000078), with ENI US having "no direction or control... except in the results to be obtained (*id.* at Art. 14, SPCM 000109). Plaintiff's "actual conduct" theory (Opp., pp. 9-10) cannot overcome these contractual allocations.

### E.      Irrelevance of Post-Incident Root-Cause Analysis and Injury Tracking.

Much of Plaintiff's Opposition (pp. 7-8, 10-11) posits that ENI US had operational control based on post-incident investigation/documentation efforts. None of this is relevant.[16] After-the-fact conduct cannot retroactively create operational control.[17] Plaintiff's reliance on the root-cause analysis (Opp., p. 7-9, 13) is especially misplaced: ENI US's shoreside safety manager testified the  "Key Lessons Learned" in *ENI US's* root cause analysis was copied *verbatim* from *Saipem's* "Incident Investigation Report"[18] – i.e. ENI US did not control the investigation regardless.

### F.      The Port-A-Let and First Report Red Herrings

Plaintiff's lead fact (Opp. p. 6, 12, 14) is the supposedly "joint" decision between ENI US

---

[15] *Fruge*, 337 F.3d at 564 ("[W]e first examine [if a principal] contractually reserved the right to control the work.").

[16] *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193–94 (5th Cir. 1991) (principal's active interest in safety, safety meetings, and company-man involvement did not constitute operational control); *Coleman v. BP Expl. & Prod.*, 19 F.4th 720, 730 (5ᵗʰ Cir. 2021) (operational control "is not met merely because the principal contractually retained general rights—for example, the right to…'inspect its progress,' [or] 'receive reports'…") (citations omitted).

[17] *See, e.g.*, *Kevin Gros Consulting & Marine Servs.*, 2016 U.S. Dist. LEXIS 13477 at *21 (conduct "after the accident" irrelevant to principal's operational control); *Cormier v. W & T Offshore, Inc*., 2013 U.S. Dist. LEXIS 53416, *39 (W.D. La. Apr. 12, 2013); 2013 WL 1567406 (principal's post-accident conduct "immaterial" to operational control).

[18] R. Doc. 68-2, p. 90:1-25; p. 91:1-11; p. 105:5-25; p. 106:1-15; p. 108:18-25l; p. 109:1-25; p. 110:1-14.

and Saipem on where to place the port-a-let. This is a red herring. The port-a-let location is not the alleged negligent condition;[19] rather, it is the transition step/platform, and alleged slipperiness of that area. Plaintiff's complaint only addresses the "staircase on the drillship *SANTORINI*" and alleged unsafe conditions of the "staircase" (R. Doc. 11, ¶¶3-4), and does not mention a port-a-let at all. Indeed, when asked how many times he had used the port-a-let during his hitches on the SANTORINI, he testified he "[couldn't] recall[,] [a] lot"; that he had done so previously without any issues; and that the port-a-let "wasn't that close" to the transition step where he claims he slipped.[20] The operational-control inquiry asks whether ENI US controlled the operations/ conditions that *allegedly caused* the injury – not some irrelevant unrelated operations/conditions.[21]

The Opposition also cites Gil's handwritten statement to suggest he first reported to the ENI US company man (Opp. p. 1, 8 and 3, citing R. Doc. 68-5). This is both incorrect and irrelevant. Plaintiff testified he first reported to the Saipem driller.[22]  And **Gil also testified his handwritten statement was wrong**: references to "company man" should have been to the Saipem driller.[23] Regardless, this "first report" is another red herring. ENI US's after-the-fact involvement cannot establish control (*see* §1.E *supra*).

---

[19] The testimony also contradicts Plaintiff's irrelevant port-a-let argument. Master Morris testified the port-a-let location "was a Saipem decision" made "in consultation with" ENI US. R. Doc. 68-9, p. 31:13-17. Consultation is not control, as the Bridging Document confirms: Element 2 assigns "Facility mechanical, facility design… and process design" to Saipem alone. R. Doc. 57-6, SPCM 000034. Further, ENI US's shoreside manager confirmed Saipem alone controlled the incident area. R. Doc. 68-2, p. 45:10-25. Plaintiff's related claim (Opp. p. 1, 6, 12) that ENI US participated in a decision "to move the port-a-let to make it easier to access" (*id.* p. 6) after Gil's fall is also wrong and misleading. Morris testified the port-a-let was never relocated; it was eventually *removed entirely* because Saipem built a permanent toilet on the rig floor. R. Doc. 68-9, p. 32. Plaintiff quotes Morris's testimony regarding *original* placement of the port-a-let to misleadingly suggest it was moved after Gil's incident, which *never happened*.

[20]  R. Doc. 69-5, p. 236:1-5,13-22; p. 243:13-25; p. 244:1-25; p. 245:1-24.

[21] *See Kevin Gros Consulting & Marine Servs.,* 2016 U.S. Dist. LEXIS 13477 at *22; 2016 WL 430413 ("[O]perational control] test…require[s] a direct link between the independent contractor[, the principal,] and the safety error which led to the injury."). *See also Coleman v. BP Expl. & Prod*., 19 F.4th 720, 730 (5th Cir. 2021) (principal's authorization of *unrelated prior operations* had no relevance to contractor's later decision to conduct its work leading to accident).

[22] R. Doc. 69-5, p. 271:3-15 ("When I got into the drill shack, I told the driller… I think I hurt something.")

[23]  *See* R. Doc. 69-5, p. 300:3-25; p. 301:1-25; p. 302:1-25; p. 303:1-3 ("Yeah, supposed to be driller.").

6

G.    **The Bridging Document Specifically Allocates Control to Saipem.**

Plaintiff argues (Opp. pp. 5, 9-11) that the default introductory statement and Elements 6, 11, and 17 of the Bridging Document transfer operational control to ENI US. This is wrong.

The default introductory statement confirms that "***any process not listed below*** [emphasis added]…shall be in accordance with ENI US's policies" (R. Doc. 57-6, SPCM 00034). Plaintiff argues this broadly "establishes that ENI [US] would retain control" (Opp. p. 10). This ignores that the Bridging Document goes on to **expressly "list below" numerous scopes exclusively within Saipem's responsibility**: facility design (Element 2); hazard management for "processes" owned/contracted by Saipem, like the port-a-let (Element 3); safe practices for Saipem-directed "equipment or processes" (Element 5); safe work practices, particularly regarding "presence, entrance and exit of personnel in [Saipem's] operating area [] (on the rig)" (Element 6); and overall "ultimate[] responsibility" of Master Morris for the safety of the vessel and onboard personnel (Element 15). Plaintiff's argument that the introductory clause overrides every enumerated assignment would render the specific designations to Saipem meaningless. And to remove any doubt, Master Morris confirmed that Saipem's rig crew controlled the operations/area at issue.[24]

Plaintiff makes the same legal error in his treatment of Element 6 ("Safe Work Practices") (Opp. p. 5, 10, 14) as with the default introductory clause: he selectively quotes *only* the preamble - that ENI US's safe work practices apply "unless otherwise specified" - to argue that ENI US's "safe work practices" universally apply. But Element 6 **does "otherwise specify" and allocates *to Saipem alone*** responsibility for all relevant sub-elements,[25] i.e., hazard communication/control and controlling "presence, entrance and exit of personnel" (R. Doc. 57-6, SPCM 00035-36).

---

[24] R. Doc. 68-9, p. 15:20–25; p. 16:8–20; p. 17:4–10; p. 94:2125; p. 95:1. ENI US denies *any hazardous condition existed* in Saipem's scope. Regardless, there is no claim against ENI US under the contractual control allocations.

[25] Two Element 6 sub-elements are allocated to ENI US ("Simultaneous Operations Planning" and "shore to the rig" access), and two are shared (illness/injury updates and "Drug and Alcohol program"). None of these is relevant.

7

#111862742v1

Elements 11 ("Incident Investigation") and 17 ("Reporting of Unsafe Working Conditions") assign *shared* duties between ENI US and Saipem to communicate, report, and investigate (R. Doc. 57-6, SPCM 000037-38). As discussed at §1.B-C *supra,* this does not amount to control: "The fact that a principal … is obligated to report continuing unsafe work practices or conditions…does not mean that the principal controls the…contractor's work."[26]

**2.     Plaintiff's Time-Charterer Arguments Fail for the Same Reasons.**

Plaintiff's Opposition as to time-charterer non-liability (pp. 9-12) relies on the same invalid arguments debunked above. It does not meaningfully address the well-established jurisprudence confirming a vessel owner – not the charterer – remains responsible for "dangerous conditions on board" and "a reasonably safe means of access"; and the time charterer is not liable "unless the cause of the harm is within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement."[27]  Absent "[c]lear, express language…the owner, not the time charterer is entirely responsible for the condition of the ship.[28]

None of the contracts altered this rubric - much less in "clear, express language" - and the DC/TC and Bridging Document *confirm* it. The Fifth Circuit has rejected identical general oversight/mere presence arguments where the charter "remove[d] from [the charterer] any control over the means by which its desired results were obtained" and the charterer was not involved in "timing or means of" operations.[29] As to "mere presence," the law is unequivocal: "Simply having a [charterer rep] on board does not shift operational responsibility or liability to the charterer."[30]

---

[26] *Coulter*, 117 F.3d at 912.

[27] *Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 791 (5th Cir. 1990).

[28] *Grogan v. Seaboard Marine, Ltd.*, 2022 U.S. Dist. LEXIS 36102, *5 (S.D. Tex. Mar. 1, 2022); 2022 WL 605799.

[29] *Callahan v. Gulf Logistics, L.L.C.*, 456 F. App'x 385, 390–91 (5th Cir. 2011).

[30]  *Dukes v. Marine*, No. 15-4948, R. Doc. 48, 2017 U.S. Dist. LEXIS 63966, *16-17 (E.D. La. Apr. 27, 2017); *Smetana v. Apache Corp.,* No. 10-349, 2011 U.S. Dist. LEXIS 134357, *17 (W.D. La. Nov. 21, 2011).

Plaintiff attempts to distinguish *Kerr-McGee* and *Menard* (Opp., pp. 12-13) by the mere presence argument, which, again, is invalid; and via the Bridging Document, which **confirms** Saipem's sole responsibility for the relevant operations/conditions, and does not transfer those responsibilities to ENI US. Also, the DC/TC contains substantially the same control-disclaiming "Results Obtained" Clause (R. Doc. 57-5, Art. 14, SPCM 000109) that every case cited by ENI US's held reserved responsibility *solely* to the vessel owner. Plaintiff's time-charterer arguments fail, particularly as his claims are limited solely by §905(b)/*Scindia* and "[t]he scope of [§905(b)/*Scindia*] vessel negligence for a time charterer...is even more limited than… for a vessel owner."[31]

**3.        Plaintiff Cannot Establish a Genuine Dispute as to Any of the Three *Scindia* Duties**

**A.        <u>Turnover duty</u>** - The *Scindia* "turnover duty" "does not include dangers which are either: (1) open and obvious or (2) [that] a reasonably competent stevedore should anticipate encountering"; and where the plaintiff knows of the condition or should reasonably anticipate encountering it, "it is considered open and obvious," and there is no breach.[32]  There is also "no [turnover] duty to supervise or inspect the work [once operations commence]" and "the unsafe condition…[was] created by the [contractor's] workers."[33]  That is this case here. The allegedly slippery step was a condition Plaintiff repeatedly navigated while using the port-a-let, and he was well aware the area might be slippery: "[W]hen you walk on a rig floor, it's always slippery as heck, all throughout, everywhere."[34] Master Morris testified no unsafe condition had been reported in the prior year.[35]  ENI US did not breach any *Scindia* "turnover duty" on the undisputed facts.

---

[31] *Payano v. Envtl., Safety & Health Consulting Servs.*, 2018 U.S. Dist. LEXIS 170061, *16-17 (E.D. La. Oct. 2, 2018); 2018 WL 4739670 *aff'd* 778 Fed. Appx. 313 (5th Cir. 2019) (summary judgment dismissing §905(b) claims against time charterer). *See also Hudson v. Schlumberger Tech. Corp.*, 452 Fed. Appx. 528, 537-38 (5th Cir. 2011).

[32] *Renteria v. Grieg Star AS,* 168 F.4th 775, 782 (5th Cir. 2026).

[33] *Romo v. Massman Constr. Co*., 615 F. Supp. 2d 488, 491 (E.D. La. 2009).

[34]  R. Doc. 69-5, p. 215:21-23.

[35]  R. Doc. 68-9, p. 95:16-25; p. 96:1-2.

9

**B.**      __Active control duty__ - The *Scindia* "active control" duty requires evidence that ENI US exercised "active control over the actual methods and operative details of the longshoreman's work"; "[m]ere presence…to monitor the progress of [relevant] operations," or attendance at safety meetings, "does not constitute active control."[36] The incident area was actually and contractually in Saipem's control.  Plaintiff offers no evidence that ENI US - who had no personnel in the area - directed the methods/operative work details. As in *Renteria*, the "mere presence" of ENI US personnel and participation in safety coordination does not create a fact issue on active control.

**C.**      __Duty to Intervene__ - The *Scindia* "duty to intervene" "is narrow and requires 'something more' than mere shipowner knowledge of a dangerous condition"; and in particular requires evidence showing a defendant's "**actual knowledge** both of the hazard and that the [longshoreman], in the exercise of 'obviously improvident' judgment, means to work on in the face of it and  therefore cannot be relied on to remedy it."[37]  **There is no evidence that ENI US had "actual knowledge"** of any condition sufficient to trigger the *Scindia* "duty to intervene."

Plaintiff's red herring port-a-let argument (Opp. p. 14-15) again does not create a fact issue on any *Scindia* duty because port-a-let location is not the relevant condition; was Saipem's decision; and Gil knew where it was and used it numerous times without incident (*see* §1.F *supra*).

<div style="margin-left:50%">

Respectfully submitted,
**JONES WALKER LLP**
/s/ *Christopher M. Hannan*
Christopher M. Hannan
Stephen B. Reynolds, Jr.
201 St. Charles Avenue
New Orleans, LA 70170-5100
T: 504.582.8000 | F: 504.582.8583
channan@joneswalker.com
sreynolds@joneswalker.com

***Counsel for ENI US Operating Co., Inc.***

</div>

---

[36] *Renteria*, 168 F.4th at 782–83.

[37] *Quansah v. MSC Mediterr. Shipping Co. SA.,* 2026 U.S. App. LEXIS 12579, *7-8 (5th Cir. Apr. 30, 2026); 2026 WL 1182169.

#111862742v1