**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **MARIO GIL** | **CASE NO. 6:24-CV-00201** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **ABC INSURANCE CO., ET AL.** | **MAGISTRATE JUDGE DAVID J. AYO** |

# RULING

Before the Court is a Joint Motion for Partial Summary Judgment [ECF No. 51] filed by Defendants ENIUS Operating Co. Inc. ("ENI") and Saipem (Portugal) Comercio Maritimo, SU, LDA ("Saipem"); a Daubert Motion [ECF No. 55] filed by ENI and Saipem; a Motion for Summary Judgment [ECF No. 52] filed by Saipem; and a Motion for Summary Judgment [ECF No. 57] filed by ENI. For the reasons that follow, the Joint Motion for Partial Summary Judgment [ECF No. 51] is GRANTED; the Daubert Motion [ECF No. 55] is GRANTED IN PART and DENIED IN PART; the Motion for Summary Judgment [ECF No. 52] filed by Saipem is DENIED; and the Motion for Summary Judgment [ECF No. 57] filed by ENI is GRANTED.

## I.
## BACKGROUND

Plaintiff Mario Gil ("Gil") alleges that while he was working aboard the SANTORINI drillship (the "Santorini"), owned by Saipem and chartered by ENI under a time charter, his right foot slipped on a metal step as he descended a stairway on the Santorini, causing an injury to his left knee and spine.[1] At the time of the alleged incident, Gil was employed as a Project Interface

[1] ECF No. 32 at 2.

Manager by Advanced Tool & Supply, LLC ("ATS"),[2] a non-party company contracted to Halliburton Energy Services, Inc. ("Halliburton"),[3] which was retained by ENI as an independent contractor to perform various well-testing services aboard the Santorini.[4] Saipem, as the vessel owner, was also retained by ENI as an independent contractor.[5]

## II.
## THE SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[6] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[8] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[9]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe,

---

[2] ECF No. 67 at 4; ECF No. 52-1 at 5.
[3] ECF No. 57-4 at 6.
[4] ECF No. 57-3 at 54.
[5] ECF No. 57-5 at 38.
[6] Fed. R. Civ. P. 56(a).
[7] *Id.*
[8] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[9] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[10] "Credibility determinations are not part of the summary judgment analysis."[11] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[12]

## III.
## THE JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON SEAMAN STATUS

ENI and Saipem argue that Gil is not a Jones Act seaman and that his claims and remedies are limited to the Longshore Harbor Workers Compensation Act ("LHWCA"). Accordingly, they argues that Gil's Jones Act, general maritime law, and state law claims must be dismissed. The Court agrees.

To qualify as a seaman under the Jones Act, an employee's duties must (1) "contribute to the function of the vessel or to the accomplishment of its mission," and (2) "have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."[13] The burden of establishing seaman status is on the plaintiff claiming the benefits of the Jones Act.[14] ENI and Saipem argue that Gil cannot satisfy either the "substantial nature" prong or the "substantial duration" prong for seaman status.

---

[10] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (the court must view all facts and evidence in the light most favorable to the non-moving party).
[11] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).
[12] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).
[13] *Chandris v. Latsis*, 515 U.S. 347, 368 (1995); *see also Sanchez v. Smart Fabricators of Texas. L.L.C.*, 997 F.3d 564, 574 (5th Cir. 2021).
[14] *Becker v. Tidewater, Inc.*, 335 F.3d 376, 390 (5th Cir. 2003).

While Gil claims that he was a Jones Act seaman in his complaint,[15] Gil did not file a response to the motion challenging his status as a seaman and has not produced evidence or argument supporting seaman status. Further, based on the summary judgment record, Gil does not meet the "substantial duration" requirement. The Supreme Court has held that a worker who spends less than 30 percent of his time in the service of a single vessel or an identifiable fleet of vessels under common ownership or control does not qualify as a Jones Act seaman.[16] Here, Gil only spent 20.5 percent of his time working aboard a single vessel or an identifiable fleet of vessels under common ownership or control in the thirteen months leading up to his injury.[17] Because Gil does not meet the "substantial duration" requirement, the Court finds that Gil does not qualify as a seaman for purposes of the Jones Act. Because Gil does not meet the "substantial duration" requirement, the Court need not address Defendants' arguments on the "substantial nature" requirement.

Recovery for injuries incurred while working on the Outer Continental Shelf, other than for injuries to a Jones Act seaman, is governed by the LHWCA.[18] The right of a longshoreman to sue a vessel owner or charterer for negligence arises exclusively under section 905(b) of the

---

[15] ECF No. 32 at 2.

[16] *See Chandris*, 515 U.S. at 371; *see also Skinner v. Schlumberger Tech. Corp.*, No. 13-03146, 2015 WL 3485893, at *6 (W.D. La. June 2, 2015), aff'd, 655 F. App'x 188 (5th Cir. 2016) (granting summary judgment on the issue of seaman status when the plaintiff spent less than 30 percent of his time in the service of a vessel or an identifiable fleet of vessels under common ownership or control).

[17] From January 1, 2022 through February 21, 2023 Gil worked a total of 317 days. ECF No. 51-6. He worked 65 of those days offshore on the Santorini, 60 days on the West Neptune, and 12 days on the Deepwater Asgard. *Id.* Because these three vessels were owned and controlled by different companies, Gil's time working on a single vessel or an identifiable fleet of vessels is only 20.5 percent (65 offshore days / 317 total days = 20.5 percent).

[18] 33 U.S.C. § 905(b); *Baham v. Nabors Drilling United States*, 721 F. Supp. 2d 499, 508 (W.D. La. 2010) ("Recovery for injury to a person, other than a Jones Act seaman, working on the Outer Continental Shelf is governed by the LHWCA.").

LHWCA.[19] Thus, Gil's claims against Saipem and ENI are restricted to vessel negligence under section 905(b).

Accordingly, the joint motion for partial summary judgment on seaman status [ECF No. 51] is granted and any claims asserted by Gil under the Jones Act, general maritime law, and state law are dismissed.

## IV.
## The Joint Motion to Exclude Expert Michael Lebsack

ENI and Saipem challenge the opinions of Gil's purported liability expert, Michael Lebsack ("Lebsack"),[20] and seek to exclude his testimony. While many of Defendants' complaints go to the weight to be assigned to Lebsack's testimony at trial rather than its admissibility, the Court finds that some portions of Lebsack's expert report should be excluded.

### A. Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and reports. A witness may be qualified as an expert through knowledge, skill, experience, training, or education.[21] A qualified expert may testify "in the form of an opinion or otherwise," provided that: (1) the expert's testimony will help the trier of fact understand the evidence or determine a fact at issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.[22] Rule 702 imposes an obligation on the trial court to ensure that

---

[19] 33 U.S.C. § 905(b); *Blanchard v. Weeks Marine, Inc.*, No. 13-5089, 2014 WL 1414640, at *2 (E.D. La. Apr. 11, 2014).
[20] Lebsack has been retained as an expert regarding maritime industry safety standards.
[21] Fed. R. Evid. 702.
[22] *Id.*

expert testimony—whether scientific or not—is not only relevant, but reliable.[23] An expert's opinion may be based on facts or data in the case of which the expert has been made aware, or facts or data which he or she has personally observed.[24] An expert may not render legal conclusions or provide opinions on legal issues.[25]

Expert testimony is relevant if it is shown "that the expert's reasoning or methodology can be properly applied to the facts in issue."[26] To be reliable, expert testimony must be "grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief."[27] The proponent of expert testimony has the burden to show by a preponderance of the evidence it is reliable, not that it is correct.[28] "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[29]

The questions of relevance and reliability are the Court's overarching concern.[30] The analysis should be performed with an eye toward whether the expert opinion will assist the trier of fact, which requires that a proffered expert be able to "bring to the jury more than the lawyers can offer in argument."[31] Whether an expert's opinion would be helpful to the trier of fact is a low bar and turns largely on whether the testimony is relevant; questions related to the bases and sources of an expert's opinion go to the weight of the testimony rather than its admissibility.[32] The Court's

---

[23] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
[24] Fed. R. Evid. 703.
[25] *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (citing *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009)).
[26] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (citing *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)).
[27] *Id.*
[28] *Johnson*, 685 F.3d at 459 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)).
[29] *Id.*
[30] *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293–94 (5th Cir. 2019).
[31] *Id.* (internal citations omitted).
[32] *Id.*

role is not to displace the adversary system, but to ensure that the disputed evidence is "sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration."[33] Exclusion of expert testimony is the exception rather than the rule—"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[34]

**B. Analysis**

**i. Methodology/Opinions Based on Speculation**

Defendants first argue that Lebsack's opinions are incorrect and speculative because his opinions are inconsistent with evidence produced in discovery. For example, Lebsack relies on post-incident photographs to opine that the step on which Gil's alleged injury occurred was improperly constructed.[35] Defendants argue that this opinion amounts to mere speculation because Gil testified that there was nothing about the construction or configuration of the step that caused him to slip.[36] The Court finds, however, that Lebsack's reliance on facts inconsistent with those proffered by Defendants is a matter for cross-examination, as this goes to the weight to be assigned to Lebsack's opinion rather than its admissibility.

Defendants also challenge the methodology used by Lebsack and argue that his opinions address common-sense issues that are within a lay juror's understanding. After reviewing the report, however, the Court finds that Lebsack's opinions are based on his professional experience in the maritime safety industry. Lebsack reviewed post-incident photographs and incident investigation reports produced by Defendants, compared the conditions to industry practices, and applied his professional experience in forming his opinions. The Court finds that Lebsack's

---

[33] *Id.* (citations omitted).
[34] *Id.* (citing *Daubert*, 509 U.S. at 596).
[35] ECF No. 55-2 at 6.
[36] *See* ECF No. 55-3 at 21-23.

methodology is sufficient to pass *Daubert* scrutiny and that his testimony would assist the jury in understanding the evidence. Any further complaints as to the adequacy of Lebsack's process in creating his expert report are matters for cross-examination.

**ii. Legal Conclusions**

Defendants also argue that Lebsack makes improper legal conclusions by conflating Saipem and ENI together in terms of liability and opining that "defendants' failures to meet their responsibilities constitute breaches of federal maritime safety standards and the maritime industry's standard of care."[37] Federal Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."[38] However, questions that merely prompt the witness to instruct the jury as to what result to reach are impermissible.[39] Likewise, the rule is not intended "to allow a witness to give legal conclusions."[40] Here, the Court finds that the statements to which Defendants object are not impermissible legal conclusions, but rather are Lebsack's opinions based upon his assessment of the underlying facts and applicable safety standards and are therefore within the domain of expert testimony.[41] Additionally, the adequacy of Lebsack's knowledge regarding the relationship between Saipem and ENI is a matter for cross-examination. In sum, the Court finds that Lebsack's opinions pass *Daubert* scrutiny for purposes of the present motion. However, the parties should be mindful that the Court will not allow Lebsack to testify regarding any impermissible legal conclusions at trial. Accordingly, defense counsel may

---

[37] See ECF No. 55-2 at 4.

[38] Fed. R. Evid. 704; *see also Owen v. Kerr-McGee Corp*., 698 F.2d 236, 240-41 (5th Cir. 1983) (Rule 704 was enacted to abolish the prior, *per se* rule against testimony regarding ultimate issues of fact, as the prior rule was found to be "unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information").

[39] *Owen*, 698 F.2d at 240-41.

[40] *Id.*

[41] *See id.*

re-urge its objection at trial if it appears that a question may elicit impermissible legal opinion testimony.

**iii. Reliance on Materials Not Produced**

Defendants also challenge Lebsack's report to the extent that it relies on materials that Defendants have not had an opportunity to review. Lebsack references various safety manuals and procedures from several nonparty companies in establishing the industry standard of care.[42] However, Defendants claim[43] that many of these manuals were not produced as part of Lebsack's reliance materials and are not generally publicly available. This raises concerns for the Court. Allowing Lebsack to testify as to his opinions based on materials unavailable to Defendants would be unfairly prejudicial because Defendants would not be able to meaningfully cross-examine Lebsack on such opinions. Thus, to the extent that Lebsack's expert report relies on materials that Defendants have not had an opportunity to review, Lebsack's testimony on those portions of his report are excluded.

**iv. Reliance on Certain Standards and Regulations**

Defendants also challenge Lebsack's reliance on certain standards and regulations in establishing the standard of care. Defendants challenge Lebsack's reference to standards and regulations created by the Occupational Safety and Health Administration ("OSHA"), the American National Standards Institute ("ANSI"), and the American Society for Testing and Materials ("ASTM") because they are not relevant.[44]

---

[42] ECF No. 55-2 at 24-25.

[43] In his response to this motion, Gil did not address Defendants' claim that these manuals were not produced and are not publicly available.

[44] It is unclear from the briefs whether Defendants also claim that Gil failed to produce these regulations. As stated previously, to the extent that Lebsack's expert report relies on materials that were not produced and are not publicly available, those portions of Lebsack's report are excluded from trial.

Lebsack references OSHA regulations to establish the industry standard of care, but Defendants argue that OSHA regulations do not apply to foreign-flagged, inspected vessels,[45] such as the Santorini. The Fifth Circuit has held, however, that while OSHA regulations do not govern seamen in the course of their duties, OSHA regulations do control standards regarding the working conditions of employees other than seamen, such as longshoremen, while working on inspected vessels.[46] Because Gil does not qualify as a Jones Act seaman, OSHA regulations are not preempted by US Coast Guard regulations in this case. Further, Coast Guard regulations are silent on the specific requirements of stairs on vessels and Lebsack explains in his report that "[t]he maritime community routinely includes OSHA rules and regulations in its safety manuals, and it accepts OSHA's safety regulations as reliable safety standards enacted for the purpose of protecting worker health. This is true even for vessels like the Santorini that may not be directly governed by OSHA."[47] The Court therefore finds that Lebsack may rely on OSHA regulations in establishing the standard of care.

The law surrounding the relevancy of ANSI guidelines is less clear. District Courts in the Fifth Circuit have found that an expert may not rely on an inapplicable regulation in establishing the standard of care when the regulation does not apply to the same "unsafe" circumstances present

---

[45] In general, the US Coast Guard pre-empts all OSHA regulations with respect to "inspected vessels." *Chao v. Mallard Bay Drilling*, 534 U.S. 235, 242 (2002). "Inspected" vessels are those vessels required by law to be inspected and certified by the U.S. Coast Guard. Gil does not dispute in his response that the Santorini was an inspected vessel.

[46] *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002) (citing *Reich v. Muth*, 34 F.3d 240, 244 (4th Cir.1994); *Clary v. Ocean Drilling & Expl. Co.*, 609 F.2d 1120, 1122 (5th Cir. 1980); *see also Rhodes v. Genesis Marine, LLC of Delaware*, No. CV 18-746, 2019 WL 3282139, at *5 (E.D. La. July 19, 2019) (finding that OSHA may enforce its regulations against employers of non-seamen aboard inspected vessels); OSHA Directive CPL 02-01-066 § XI ("In most circumstances, OSHA does have authority over employers for the working conditions of their employees, other than seamen, who are exposed to occupational hazards while working on inspected vessels.").

[47] ECF No. 55-2 at 9-10 fn. 8.

in the case before it.[48] Lebsack relies on ANSI standards to establish the standard of care regarding stairways on a vessel. ANSI standards, however, deal with general workplace safety, not vessel safety. The Eastern District of Louisiana excluded portions of an expert's report that used ANSI standards to establish the standard of care for stairs on inspected vessels, finding that "[t]he structure and construction of stairs on a vessel are not comparable to the broad, general workplace ANSI standards on which [the expert] relies."[49] Lebsack does not explain why standards for stairs in a general workplace should apply to stairs on a vessel, and Gil does not attempt to make an argument in this regard either. In fact, Gil argues later in his response that "[m]aritime and offshore employers and vessel owners are held to entirely different safety standards, and owe entirely different duties to their employees and contractors, than business owners owe to the public on land."[50] Thus, to the extent that Lebsack's expert report relies on ANSI standards, those portions of Lebsack's report are excluded from trial.

Defendants also challenge Lebsack's reliance on ASTM regulations, but do not provide argument as to why these regulations are inapplicable. According to Lebsack's report, ASTM creates standards for maritime safety.[51] Without further argument as to why these standards are inapplicable, the Court will not exclude them at this time.

Finally, Defendants challenge Lebsack's opinion that the Santorini may not have complied with US Coast Guard regulation 46 C.F.R. §42.15-75(d) regarding "satisfactory means" for crew access to walkways. This regulation appears in Subchapter E of the Coast Guard regulations, which

---

[48] *See Matter of M&M Wireline & Offshore Services, LLC*, No. 15-5338, 2017 WL 480603, at *7 (E.D. La. Feb. 3, 2017) (finding that a construction specific OSHA regulation, without evidence that construction practices were at issue in the case, was inapplicable and therefore irrelevant); *Minton v. Intercontinental Terminals Co., LLC*, 697 F. Supp. 3d 690, 701 (S.D. Tex. 2023).

[49] *Carbo v. Chet Morrison Servs., LLC*, No. CIV.A. 12-3007, 2013 WL 5774948, at *3 (E.D. La. Oct. 24, 2013). Both the expert in *Carbo* and Lebsack relied on ANSI regulation A1264.1. *Id.* at fn.5.

[50] ECF No. 69 at 11.

[51] ECF No. 55-2 at 15.

generally addresses vessel Load Lines.[52] Pursuant to 46 C.F.R. §42.03-10(c), a vessel flagged in a country adhering to the 1966 International Convention on Load Lines[53] that "hold[s] currently valid certificates issued pursuant to the 1966 Convention . . . [is] deemed to be in compliance with the load line requirements found to be equally effective as those established in this part and therefore in compliance with . . . the regulations in this part as authorized by such laws."[54] Gil does not dispute in his response that the Santorini held a valid International Load Line Certificate at all relevant times[55] and that it is thus deemed to be in compliance with the entirety of the regulations provided under 46 C.F.R. Subchapter E, including 46 C.F.R. § 42.15-75(d). Thus, the Court finds that Lebsack's opinion that the Santorini may not have complied with 46 C.F.R. §42.15-75(d) is excluded from trial.

**v. Reliance on Remedial Measures**

Defendants also challenge Lebsack's reference to remedial measures taken by Defendants following Gil's incident, such as repainting the step with additional non-skid paint.[56] Under Rule 407, evidence of subsequent remedial measures that would have made an injury less likely to occur is not admissible to prove negligence.[57] There is no explicit exception for evidence of subsequent remedial measures where such evidence has been utilized by expert witnesses.[58] Thus, the Court finds that Lebsack cannot testify as to any remedial measures taken by Defendants following Gil's

---

[52] *See* 46 C.F.R. Subchapter E.
[53] The Santorini is flagged in the Bahamas. ECF No. 55-9. The Bahamas accessioned to the 1966 International Convention on Load Lines in 1976. UNITED NATIONS TREATY SERIES, https://treaties.un.org/Pages/showDetails.aspx?objid=0800000280126bbe&clang=_en
[54] 46 C.F.R. §42.03-10(c).
[55] ECF No. 55-9.
[56] *See* ECF No. 55-2 at 7.
[57] Fed. R. Evid. 407.
[58] *See id.*

incident, unless Gil first establishes that the evidence falls within an exception under Rule 407, such as for impeachment purposes.

Therefore, the joint motion to exclude [ECF No. 55] is granted in part and denied in part. The motion is granted to the extent it seeks to exclude Lebsack's testimony relying on (1) materials that Defendants have not had an opportunity to review, (2) ANSI standards and Coast Guard regulation 46 C.F.R. §42.15-75(d), and (3) remedial measures taken by Defendants following Gil's incident. The motion is denied in all other respects.

## V.
## SAIPEM'S MOTION FOR SUMMARY JUDGMENT

Saipem argues that it cannot be held liable for negligence as the owner of the Santorini because there is no evidence of a hazard under Saipem's control that caused Gil to slip. The Court disagrees.

### A. Legal Standard

Gil's negligence claims against Saipem as the vessel owner are governed by 33 U.S.C. § 905(b). A vessel owner owes three narrow *Scindia* duties to workers covered under section 905(b): the "turnover duty," the "active control duty," and the "duty to intervene."[59] Saipem does not dispute that it owed Gil the active control duty because it exercised control over the Santorini and the step involved in the incident. Thus, the only question before the Court is whether there is a genuine issue of material fact as to whether Saipem breached the active control duty.

Under the active control duty, "the vessel has a duty to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the

---

[59] *Kitchens v. Stolt Tankers B.V.*, 657 F. App'x 248, 251 (5th Cir. 2016); *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981).

active control of the vessel during the stevedoring operation."[60] "[L]iability under the active control duty is premised on the presence or existence of a 'hazard' under the active control of the vessel."[61]

**B. Analysis**

Gil's central argument is that the lack of or insufficient non-slip surface on the step constitutes a hazard for which Saipem is responsible. Even assuming that the step had no non-slip coating, however, there is no legal basis under Fifth Circuit precedent for Gil's proposition that the absence of a non-slip surface on a step alone constitutes an unreasonably dangerous working condition. In *Kitchens*, the Southern District of Texas found that the plaintiff had failed to produce any evidence of a hazard on the vessel deck where he fell, even when the plaintiff pointed to the lack of a non-skid surface on the walkway.[62] On appeal, the Fifth Circuit affirmed the district court's decision, stating that "this court has not held that the lack of a non-skid surface alone is sufficient to give rise to a finding of liability under the active control duty exception."[63] Additionally, Gil cannot rely on evidence of remedial measures to survive summary judgment. Gil points to the fact that the step was repainted after the incident as evidence that the step was hazardous.[64] Under Rule 407, however, evidence of subsequent remedial measures that would have made an injury less likely to occur is not admissible to prove negligence.[65]

---

[60] *Id.* (internal quotation omitted).
[61] *Id.*
[62] *Kitchens v. Stolt Tankers B.V.*, No. 4:14-CV-2088, 2016 WL 5171411, at *4-5 (S.D. Tex. Jan. 13, 2016), *aff'd sub nom. Kitchens v. Stolt Tankers B.V.*, 657 F. App'x 248 (5th Cir. 2016).
[63] *Kitchens*, 657 F. App'x at 251.
[64] For example, when asked whether he would have applied the additional non-slip if Gil's accident had not occurred, Santorini Master Morris agreed that he "would not have done so if we hadn't had the – the slip." ECF No. 67-4 at 69; *see also* ECF No. 55-2 at 7.
[65] Fed. R. Evid. 407.

Thus, the Court must determine whether there is any other evidence sufficient to preclude summary judgment. After reviewing the summary judgment record, the Court finds that there is a triable issue as to whether Saipem breached the active control duty.

First, while the majority of Lebsack's expert report focuses on the lack of effective non-slip coating, Lebsack references other conditions of the stairs that, in his expert opinion, do not meet the maritime industry standard of care. Most prominently, Lebsack opines that the steps "may not have met widely accepted step standards because they were not uniform in width and height and lacked contrasting paint."[66] In reaching this conclusion, Lebsack relies partially on ANSI standards, which the Court has excluded from trial, but also relies on ASTM standards,[67] which the Court has not excluded at this time, and other standards that Defendants have not challenged as inapplicable.[68] Lebsack also relies on his professional experience in the maritime safety industry to reach this conclusion.

Second, the ENI Investigation Report, based on Saipem's investigation, lists under "Causes" that the equipment had "[i]nadequate/incomplete design specifications."[69] Chad Harrell, a safety manager for ENI, also agreed that "Saipem told ENI that they believed that there was an inadequate/incomplete design specifications that was a root cause of this accident."[70]

---

[66] ECF No. 55-2 at 13.
[67] While Defendants have challenged the admissibility of ASTM standards to establish the standard of care, the Court cannot exclude portions of the expert report relying on such standards without further argument.
[68] These standards include the National Safety Council's Accident Prevention Manual and the American Bureau of Shipping's Guidance Notes for the Application of Ergonomics to Marine Systems.
[69] ECF No. 67-3 at 3.
[70] ECF No. 67-2 at 52-53. Saipem argues that later statements made by Harrell in the same deposition conflict with his earlier statement, amounting to a correction of his prior testimony. The Court finds, however, that absent a clear retraction of testimony, it is the jury's role to determine the weight to give to this testimony.

Based on this evidence, a reasonable jury could conclude that the condition of the stairs constituted a hazard for which Saipem is liable. Therefore, Saipem's motion for summary judgment [ECF No. 52] is denied.

## VI.
## ENI's Motion for Summary Judgment

### A. Vicarious Liability

ENI first argues that it cannot be held vicariously liable for the negligence of its independent contractors because it retained no operational control over the conditions or operations aboard the Santorini at the time of the alleged incident.[71] The Court agrees.

#### i. Legal Standard

Under both Louisiana law and general maritime law, a principal may only be liable for injuries caused by its independent contractor if the principal either (1) engages in an ultrahazardous activity or (2) retains or exercises operational control over the manner and methods of the independent contractor's work.[72] The Fifth Circuit has held that "drilling operations are not ultrahazardous,"[73] so the only question for this Court is whether ENI retained operational control over the work performed on the Santorini.

The Fifth Circuit has consistently held that "[o]perational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way."[74] Under this standard, it is not enough

---

[71] The Court notes that, while ENI has raised a defense to vicarious liability, Gil's complaint does not claim that ENI was vicariously liable for Saipem's negligence. However, as the parties have submitted briefing contesting vicarious liability, the Court will address it.

[72] *Skinner v. Schlumberger Tech. Corp.*, 655 F. App'x 188, 192 (5th Cir. 2016).

[73] *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987).

[74] *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003); *see also Coleman v. BP Expl. & Prod., Inc.*, 19 F.4th 720, 730 (5th Cir. 2021).

that a principal retains some general rights to inspect progress, require compliance with safety rules, or keep a representative physically present at the jobsite to ensure compliance with the contract.[75] "[A]bsent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal . . . cannot be liable under the operational control exception."[76] The relevant inquiry is whether the principal "had control over the operation of the particular activity during which the plaintiff was injured."[77]

**ii. Relevant Contracts**

The Fifth Circuit instructs courts to first examine the extent to which a principal contractually reserved a right to control the work and then look to the actual conduct of the parties in carrying out the contract.[78]

Gil does not dispute that Saipem, Halliburton, and ATS are all subcontractors of ENI. The contract between ENI and Halliburton (the "ENI/Halliburton Contract") expressly establishes that Halliburton is an independent contractor of ENI and states that Halliburton has "exclusive control over its EQUIPMENT, materials and CONTRACTOR PERSONNEL . . . ."[79] It also states that:

> [ENI] shall have no direction or control of [Halliburton], CONTRACTOR PERSONNEL or SUBCONTRACTORS [including ATS]. The actual performance and supervision of the SERVICE shall be by [Halliburton], but [ENI] or its COMPANY REPRESENTATIVE shall have full and complete access to the operations to determine whether the SERVICE is being performed by [Halliburton] in accordance with all provisions of the CONTRACT . . .[80]

The contract between Halliburton and ATS (the "Halliburton/ATS Contract") reciprocally establishes that ATS is an independent contractor of Halliburton, stating that "Halliburton shall

---

[75] *Coleman*, 19 F.4th at 730.
[76] *Fruge*, 337 F.3d at 564 (citing *Coulter v. Texaco*, 117 F.3d 909, 912 (5th Cir.1997)).
[77] *Hebert v. CXY Energy, Inc.*, 72 F. Supp. 2d 681, 687 (W.D. La. 1999) (citing *Robertson v. Arco Oil & Gas Co.*, 948 F.2d 132, 133 (5th Cir.1991)).
[78] Fruge, 337 F.3d at 564; *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991).
[79] ECF No. 57-3 at 54.
[80] *Id.*

have no direction or control of [ATS] or its employees; Halliburton being solely interested in the results to be obtained."[81] Further, as a subcontractor of ENI's independent contractor Halliburton, ATS was contractually defined as an independent contractor of ENI.[82]

The charter agreement between ENI and Saipem (the "ENI/Saipem Charter Agreement") also expressly establishes that Saipem is an independent contractor of ENI and states that ENI "shall have no direction or control of [Saipem] or its employees, agents, REPRESENTATIVE(S) or SUB-CONTRACTORS, except in the results to be obtained."[83] Under the contract, Saipem was responsible for "the Health, Safety, Environment and Public Safety management of the work." [84] It also states that Saipem "undertakes to maintain the [Santorini] in first class condition"[85] and that it "shall be responsible for the moving or towing of the [Santorini] . . . and for the overall direction of moving operations and such operations onboard the [Santorini] as may be necessary for the safety of the [Santorini] and CONTRACTOR PERSONNEL . . . ."[86]

Additionally, ENI and Saipem created a Bridging Document allocating certain responsibilities between the parties. Under the Bridging Document, Saipem was responsible for the Santorini's facility design,[87] for conducting the hazards analysis of the Santorini,[88] for controlling the presence of personnel in Saipem's operating area,[89] and for "[e]stablish[ing]

[81] ECF No. 57-4 at 6.
[82] Under the ENI/Halliburton Contract, Halliburton was required to "ensure that the terms of any subcontract shall be equivalent to the obligations of" the ENI/Halliburton Contract; and "that any SUBCONTRACTOR [including ATS] shall be bound to observe the provisions of [the ENI/ Halliburton Contract] that would be applicable to such SUBCONTRACTOR as if it directly provided the SERVICES." ECF No. 57-3 at 27. Gil did not dispute in his response that this language defines ATS as an independent contractor of ENI.
[83] ECF No. 57-5 at 38.
[84] *Id.* at 7.
[85] *Id.* at 26.
[86] *Id.* at 28.
[87] ECF No. 57-6 at 1.
[88] *Id.*
[89] *Id.* at 3.

responsibility and authority for stop work when an unsafe condition or act could result in an undesirable event, or when witnessing imminent risk, or danger to people, equipment, and the environment."[90] It also specifies that "Santorini Master (OIM) is ultimately responsible for safety and integrity of the Ship and Personnel on board. He has the ultimate authority on board and is in 'command' during in an emergency."[91]

**iii. Analysis**

The Court finds that ENI did not retain operational control over the work performed on the Santorini. Under the provisions of the agreement, ENI had no control over Gil as an employee of ATS and had no direction or control over the operations performed by Saipem except in the results to be obtained. While ENI had access to the operations to determine whether they were in compliance with the relevant contracts, there is no evidence that ENI had control over the manner and methods of the work performed on the Santorini. Saipem also had sole control over the condition of the Santorini, including the deck and stairs where Gil's alleged injury occurred.

Gil relies on a statement made by Santorini Master Morris that the Saipem rig crew would "conduct the operations as directed by [ENI]."[92] Nothing about this statement indicates, however, that ENI had direct control over decisions that caused Gil's alleged injury or that it had more than a generalized involvement in the overall operations.

Gil also argues that ENI exercised operational control because it had personnel on board (including a company man and a Health and Safety representative), required compliance with ENI safety rules, and was involved with the safety response to Gil's incident.[93] However, this conduct does not constitute direct control over the step-by-step process of accomplishing the work

---

[90] *Id.* at 4.
[91] *Id.* at 5.
[92] ECF No. 68-9 at 15.
[93] Gil does not cite to any caselaw showing that these actions constitute operational control.

performed aboard the Santorini. First, "[t]he physical presence of a representative of a principal is not sufficient to show supervision or control."[94] Second, an agreement between a principal and its contractor requiring the contractor to abide by the principal's safety regulations does not establish operational control.[95] Third, while ENI was involved with the safety of personnel aboard the Santorini, "[t]he fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control."[96]

Additionally, Gil argues that ENI exercised operational control because ENI was consulted on the placement of the port-a-let that Gil was walking toward when he fell. The Court finds, however, that this conduct does not amount to direct control over the operations conducted aboard the Santorini. Even if ENI had some level of control over the placement of the port-a-let, it did not "ha[ve] control over the operation of the particular activity during which the plaintiff was injured."[97] The placement of the port-a-let is not the alleged negligent condition in this case. Gil alleges that the condition of the *staircase* caused his injury—there is no evidence that ENI had control over vessel stairways.

Gil has not pointed to any evidence that ENI gave specific instructions or directives to Saipem as to how its employees should work or how to perform any part of their duties. Nor is there evidence that ENI made any express or implied order to Saipem to engage in unsafe work practices regarding the condition of the Santorini's deck and stairs which led to Gil's injury. Thus,

---

[94] *Fruge*, 337 F.3d at 564.

[95] *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir.1992); *Coleman*, 19 F.4th at 730; *Hebert*, 72 F. Supp. 2d at 687.

[96] *Duplantis*, 948 F.2d at 193 (affirming the district court's finding that there was no operational control despite an employee of the principal holding safety meetings and having a role in firing a contractor's employee for safety violations).

[97] *Hebert*, 72 F. Supp. 2d at 687 (citing *Robertson*, 948 F.2d at 133).

ENI cannot be held vicariously liable for the negligence of its independent contractors because it retained no operational control over the work performed or the conditions of the Santorini.

**B. Time-Charterer Liability**

ENI also argues that it cannot be held liable as the time-charterer of the Santorini because it was not contractually or practically responsible for the alleged conditions aboard the Santorini that led to Gil's injury. The Court agrees.

**i. Legal Standard**

Gil's exclusive basis for any claim against ENI arising out of its own negligence is 33 U.S.C. § 905(b).[98] Section 905(b) claims are limited to suits for negligence against a "vessel."[99] Section 902(21) defines "vessel" as the vessel upon which a covered employee is injured, "and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."[100] Given this designation, ENI, as the vessel's time charterer,[101] can be subject to liability under section 905(b).[102] The *Scindia* duties, however, do not apply to time-charterers.[103] When a defendant is only subject to suit for vessel negligence under section 905(b) because it is a time-charterer, "the duties and responsibilities against which the claim of the

[98] Section 905(b) authorizes a cause of action for injury "caused by the negligence of a vessel," and the term "vessel" is defined to include "any vessel … and said vessel's owner… [and] charterer." 33 U.S.C. §902(21).

[99] 33 U.S.C. § 905(b).

[100] 33 U.S.C. § 902 (21).

[101] Gil claims in his response that ENI should be qualified as an "operator" instead of merely a time-charterer. There is no evidence, however, that ENI took control over the vessel such that it was an operator of the Santorini. *See* discussion *supra* Part V.A.iii. Gil also has not claimed that ENI was a demise charterer, and the charter agreement does not reflect such an arrangement.

[102] *See, e.g.*, *Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 536 (5th Cir. 2011); *Kerr –McGee v. Ma–Ju Marine Servs., Inc.*, 830 F.2d 1332, 1338–39, 1343 (5th Cir.1987).

[103] *Kerr-McGee*, 830 F.2d at 1340 ("*Scindia*, the leading case describing the negligence standards that apply in a section [90]5(b) action does not set the duty of time charterers. Through the Supreme Court used the word 'vessel' throughout its opinion, the context of the case, as well as the Court's alternate use of 'shipowner,' suggest that the duties prescribed in *Scindia* apply only to true owners or other parties with similar dominion over the boat. The Court was not using 'vessel' in its broader, section 2(21) sense.").

defendant's negligence must be measured are necessarily limited to those which arise out of and are founded on the relationship which the time-charter establishes between the defendant and the vessel."[104] The responsibility of a time charterer is "generally determined by its charter agreement with the vessel owner."[105] In sum, "a time-charterer is not liable under [section 905(b)] unless the cause of the harm is within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement."[106] Thus, a time charterer is generally not liable for negligence of the vessel's crew or the condition of the vessel under section 905(b) unless responsibility has been transferred by the clear, express language of the charter agreement.[107]

**ii. Analysis**

There is no evidence that ENI is responsible in its traditional sphere as a time charterer for conditions such as those that allegedly caused Gil's injury. There is also no evidence that ENI had anything to do with the construction or design of the steps, was responsible for the condition of the stairs when Gil was injured, or that it ever prevented or discouraged Saipem from changing or correcting those matters. Thus, the question is whether the contract between ENI and Saipem clearly shifted responsibility to ENI to ensure that hazardous conditions of the Santorini were

[104] *Id.* at 1339, 1343 (holding that a time charterer owed no duty to the plaintiff because "the defendant's legal relationship to the vessel [did] not impose the right and duty of control" over the conditions and activities giving rise to the plaintiff's suit).
[105] *Id.* at 1340.
[106] *Id.* at 1343. The spheres of activity in which a time charterer traditionally exercises control "include choosing the vessel's cargo, route, and general mission, as well as the specific time in which the vessel will perform its assignment." *Menard v. LLOG Expl. Co., LLC*, 259 F. Supp. 3d 475, 482 (E.D. La. 2017).
[107] *Kerr–McGee*, 830 F.2d at 1343; *see also Grogan v. Seaboard Marine, Ltd., Inc.*, No. CV H-20-3337, 2022 WL 605799, at *1 (S.D. Tex. Mar. 1, 2022) ("Clear, express language is needed to rebut the presumption that the parties did not intend to shift responsibility for negligence and unseaworthiness to the charterer."); *Becker*, 586 F.3d at 373.

corrected. Based on the summary judgment record, the Court finds that the terms of the agreement did not shift such a responsibility to ENI.

The ENI/Saipem Charter Agreement makes clear that Saipem would be responsible for the condition of the vessel, stating that Saipem "undertakes to maintain the [Santorini] in first class condition."[108] It also states that Saipem has the duty:

> to keep all items of EQUIPMENT and cargo loaded and stored aboard said [Santorini] in a proper and seaworthy manner, and to keep the [Santorini] in all respects seaworthy and outfitted to perform the SERVICE.
> [Saipem] shall by its own inspection ensure that this obligation is fulfilled at all times;
>
> to provide safe working conditions and to comply with all of [ENI]'s written health and safety regulations;
>
> to maintain proper barriers, guard rails and other safety devices, to lessen hazards during the drilling and completion of well(s) hereunder . . . .[109]

The plain text of this agreement contains nothing indicating that ENI had control over decisions relating to the alleged hazardous condition of the steps involved in Gil's injury. Additionally, the Bridging Document specifies that Saipem was responsible for the Santorini's facility design,[110] for conducting the hazards analysis of the Santorini,[111] for controlling the presence of personnel in Saipem's operating area,[112] and for "[e]stablish[ing] responsibility and authority for stop work when an unsafe condition or act could result in an undesirable event, or when witnessing imminent risk, or danger to people, equipment, and the environment."[113] It also specifies that "Santorini

---

[108] ECF No. 57-5 at 26.
[109] *Id.* at 35-36.
[110] ECF No. 57-6 at 1.
[111] *Id.*
[112] *Id.* at 3.
[113] *Id.* at 4.

Master (OIM) is ultimately responsible for safety and integrity of the Ship and Personnel on board. He has the ultimate authority on board and is in 'command' during in an emergency."[114]

Gil argues that the parties shifted responsibility for vessel safety to ENI because the Bridging Document provides that any process not listed "shall be in accordance with ENI's policies and procedures,"[115] that "ENI's Safe Work Practices" would be used "unless otherwise specified,"[116] that ENI would be involved in incident investigations,[117] and that ENI would share responsibility for communicating the reporting process for unsafe conditions.[118] The Court finds, however, that this language does not shift responsibility to ENI to ensure that hazardous conditions of the Santorini were corrected. Even if the responsibilities prescribed in the Bridging Document were beyond the scope of the traditional time-charter role, they do not indicate that ENI had a duty to maintain the step or general work area where Gil's alleged injury occurred.

Ultimately, neither the ENI/Saipem Charter Agreement nor the Bridging Document alter ENI's traditional sphere of control such that it is responsible for the conditions that allegedly caused Gil's injury. Responsibility for maintaining the safety of the Santorini's deck and stairs was left solely to Saipem.

Relying on the same reasoning used to argue that the operational control exception applies in the vicarious liability context, Gil also argues that ENI's actual conduct exceeded the traditional time-charterer role and shifted responsibility for vessel safety to ENI.[119] The Court finds, however, that these arguments fail for the same reason—ENI's conduct does not show that it had control

[114] *Id.* at 5.
[115] *Id.* at 1.
[116] ECF No. 57-6 at 2.
[117] *Id.* at 4.
[118] *Id.* at 5.
[119] Gil does not cite any cases showing that these actions exceed the traditional time-charter role such that ENI was responsible for maintaining vessel conditions.

over the allegedly hazardous conditions aboard the Santorini that caused Gil's injury. There is no evidence that ENI had any practical responsibility for maintaining vessel stairways or identifying hazards on the Santorini.

Because Gil is unable to show that there is clear language shifting responsibility for vessel conditions to ENI, or that ENI's actual conduct exceeded the traditional time-charterer role such that it was responsible for correcting hazardous aboard the Santorini, there is no genuine issue of material fact warranting trial.

Thus, as ENI cannot be held vicariously liable for the negligence of its independent contractors, and also cannot be held liable as the time-charterer of the Santorini, ENI's motion for summary judgment [ECF No. 57] is granted.

## VII.
## CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that the Joint Motion for Partial Summary Judgment [ECF No. 51] is GRANTED and that any claims asserted by Gil under the Jones Act, general maritime law, and state law are DISMISSED.

IT IS FURTHER ORDERED that the Daubert Motion [ECF No. 55] is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent it seeks to exclude Lebsack's testimony relying on 1) materials that Defendants have not had an opportunity to review, 2) ANSI standards and Coast Guard regulation 46 C.F.R. §42.15-75(d), and 3) remedial measures taken by Defendants following Gil's incident. The motion is denied in all other respects.

IT IS FURTHER ORDERED that the Motion for Summary Judgment [ECF No. 52] filed by Saipem is DENIED and the Motion for Summary Judgment [ECF No. 57] filed by ENI is GRANTED and all claims asserted against ENI are DISMISSED.

THUS DONE in Chambers on this 24th day of August, 2026.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE